## THREE THOUSAND EIGHT HUNDRED AND EIGHTY BOXES OF OPIUM *v.* UNITED STATES.

*(Circuit Court, D. California. September 20, 1883.)*

1. CUSTOMS DUTIES—SMUGGLING—EVIDENCE—DECLARATIONS OF STEWARD OF SHIP.

 Declarations of the steward of a ship, on which it is claimed certain opium was smuggled, made to the officers seizing such opium an hour after the seizure, but while the opium was in their possession near the place of seizure, waiting to be transported, *held* admissible, in an action to condemn such opium, as part of the *res gestæ,* though not made in the presence of, or by authority or with the knowledge of, the claimant.

2. SAME—LETTERS OF THIRD PARTIES.

 A letter written by a third party, whom the evidence tended to implicate, to other parties in China two months after the seizure, apparently referring to the transaction, and left by the writer with the claimant, who added a paragraph thereto, also seemingly referring to the transaction, and a letter written by a Chinaman to another Chinaman in China, supposed to refer to passages in the other letter, both letters being put in the same envelope, and directed and mailed to the party in China, also *held* admissible.

3. SAME—PROBABLE CAUSE—REV. ST. § 909—BURDEN OF PROOF.

 When the evidence is sufficient to show probable cause, in cases of information to condemn smuggled goods, the burden of proof is on the claimant to show the innocence of the transaction.

4. SAME—PREPONDERANCE OF EVIDENCE—PROOF BEYOND REASONABLE DOUBT—FORFEITURE OF GOODS.

 A mere preponderance of evidence, in a case by information to condemn smuggled goods, in favor of the guilt of the transaction, will justify a decree of forfeiture.

Information *in rem* to Condemn Smuggled Opium.

*Philip Teare,* U. S. Atty., and *A. P. Van Duzer,* Asst. U. S. Atty., for libelant.

*W. H. L. Barnes* and *George W. Towle, Jr.,* for claimant.

SAWYER, J. This is an appeal from the decree of the district court, condemning the opium in question, on the ground that it had been smuggled into the port of San Francisco. The record from the district court contains nearly 1,700 pages of legal cap, and nearly 800 pages additional testimony have been taken in this court. The case was argued orally, and submitted a long time ago, the argument occupying 13 days, with leave to file printed briefs, the last of which was filed March 10, 1883.

Owing to a large number of cases having precedence, and the large record to examine, it was impossible to properly take the case up before the summer vacation, or to dispose of it till now. The large amount of new testimony taken in this court is upon the points wherein the district court held the evidence to be deficient, and is additional to, and not as has been claimed in conflict with, the claimant's case as made in the district court; and it is of such a character as to require a thorough and careful re-examination of the entire case, and such examination has been given to it. The following

facts, when stated as facts, are satisfactorily shown by the evidence. On doubtful points the substance of the testimony is stated:

On the night of January 3-4, 1882, the steam-ship City of Tokio was lying at the outer end of the Pacific Mail Steam-ship Company's wharf, extending from the foot of First street, in the city of San Francisco, into the bay in a southerly direction on the easterly side of the wharf. She had arrived from Hong Kong, China, and been docked on December 25, 1881, or nine days previously. The steam-ship City of Sydney was at the same time lying at the same wharf on the westerly side, directly opposite the City of Tokio. The City of Sydney runs between San Francisco and Australia, stopping each way at Honolulu, in the Sandwich islands. She was, at the time, advertised to leave for Australia on January 14, 1882, or 10 days later. A few minutes after midnight, not to exceed from 5 to 15 minutes, police officers Egan and Smith, patrolling the harbor, were going down the bay in a boat from Folsom-street wharf towards the Pacific Mail wharf, and when a short distance from the end of Beale-street wharf, at about the point marked on the diagram annexed to the findings, they saw a whitehall boat about 300 yards distant, near the steam-ship City of Tokio, between them and the steam-ship, not at the side of the ship nor in contact with it, but a short distance off, pulling with muffled oars in a southerly direction past the stern of the steamer. The boat, when discovered, was probably not less than 50, nor more than 150, feet distant from the ship. At first they thought it was the government lookout boat, but as soon as it had passed the stern of the Tokio, they saw it was not, and gave chase. The boat pulled southerly for some distance, and then turned in on the westerly side of the wharf, where it was met by the officers, somewhere between the City of Sydney and the slips of the Central Pacific Railroad's transfer steamers, as it had changed its course. The diagram shows the situation of the wharves and steamers. In the boat were the claimant, James K. Kennedy, and a boatman named McDermot. Egan says he asked what they had, and "they said they did not know." Egan then jumped into the boat and put irons on the men, ironing them together. Egan says they were very much excited, and that one of them said: "Good God, you are not going to arrest us! We are men of families. Take the stuff and let us go;" that "they would land anywhere and give up the stuff;" that we could "keep the boat and all that was in it, and let them go. It would do no good to arrest them."

After this communication Egan and Smith took the boat in tow, and returned to Folsom-street wharf, whence they had started. It was a stormy night, and the bay was rough; so rough that the claimant and McDermot were afraid that their boat, heavily loaded as it was, would swamp, and being ironed together, and one of them unable to swim, they earnestly asked to be taken into the other boat on that expressed account. Egan refused, whereupon Kennedy commenced throwing overboard some of the packages to lighten the boat; but, upon Egan's threatening to shoot them if they did not stop, he desisted after throwing over three packages similar to those remaining in the boat. The wind was from the south-east, driving the waves—a heavy chop sea—directly against the eastern side of the Tokio, while the Sydney, on the other side of the wharf, was partially protected and in comparatively still water. That it was rough, with considerable sea, there can be no doubt. On that point all the witnesses, including Egan and Smith, agree. Officer Metzler designates it as "a south-east gale." There was, ordinarily, a custom-house lookout boat on watch anchored easterly of the Tokio, a short distance off. This is the boat which the captured boat was supposed to be when first seen. But the sea was so rough on this night that it was deemed unsafe for it to be there, and it was accordingly taken in. Such is the uncontradicted testimony as to the weather and condition of the bay. The weather

grew more stormy and the sea rougher as the night wore on. It was a moon-light night, but cloudy, and at times rainy, and the moon was well down in the west, and hidden by the sheds of the wharf, when the boat was first dis-covered. On reaching the Folsom-street wharf, officer Smith took the claim-ant, James K. Kennedy, and McDermot to the district police station, Egan remaining with the captured boat till his return in some 10 to 15 minutes, probably 15. About 5 minutes after Smith left, and while waiting for Smith's return, Egan saw a man at a distance on the wharf, apparently looking for them, but there was no conversation between them, and he was not identi-fied. Upon the return of Smith, two other officers, Metzler and Dillon, ar-riving soon after, the boat was unloaded and its contents placed upon the wharf, the packages being counted as they were passed out. After being placed upon the wharf, the packages were again counted. There were found to be 97 square packages, weighing 20 pounds each, carefully wrapped in Chinese matting, sewed with twine, and neatly tied or strapped with bam-boo splints, in the usual mode of strapping packages of merchandise by the Chinese. Each package contained two soldered tin boxes or cans, the cans being new, weighing 10 pounds each; each can containing 20 small brass boxes; each small box containing one-half pound, or five taels, of prepared opium, labeled with Chinese labels, presenting the same general appearance in all respects as the prepared opium regularly imported from China through the custom-house, except that none of the half-pound or five-tael boxes had United States revenue stamps upon them, the whole amounting to 3,880 boxes. Three like packages, doubtless containing 120 like boxes each, had been thrown overboard. Thus the boat, at the time of the capture, contained 100 packages, or 2,000 pounds or 20,000 taels, of prepared opium, valued at about $20,000 to $25,000, as claimed by the United States attorney. There were also found two rolls of silk. Egan says it might have taken 20 min-utes to unload the stuff, and Metzler, from half to three-quarters of an hour. Egan passed the packages out, Metzler received them, Dillon piling them up on the wharf.

It is highly probable, therefore, that, from the time of their arrival at the wharf, including the time of the absence of Smith (say 15 minutes) with the prisoners, till the unloading and recounting of the packages on the wharf were completed, three-fourths of an hour to an hour had elapsed, most likely a full hour. After the recounting on the wharf, and while they were waiting for an express wagon to remove the goods, and not before, as inadvertently stated by the district judge, Officer Smith called Egan's attention to a man standing a short distance off, who had approached from the west on Folsom street, when both officers approached him; whereupon the man said: "One at a time; I want to do business with one at a time." He gave his name as Ken-nedy. It afterwards appeared in evidence, and I so find the fact to be, that this man, who at the time was unknown to the officers, was Henry Kennedy; that he is a brother of James K. Kennedy, the claimant; and that he was, at that time, and on the last preceding voyage of the Tokio he had been, the steerage steward of that vessel. The following is the direct testimony of Egan as to what took place at that interview: "At first he (Henry Kennedy) said if I would let those men go, he would give me two thousand dollars. Then he raised it up to ten thousand, and said we could keep the stuff to let those men go; he did not want to be exposed." And he said, "You can keep the stuff, and I will show you, too, where you can sell it." Egan testified that he sent Officer Smith to him, and after Smith had talked with him a while, he (Egan) talked with him again, when "I (Egan) says, 'What is your business?' He (Henry Kennedy) said, 'I am a calker by trade; but,' says he, 'I am in the smuggling business now,' and, says he, 'if you let these men go, I will give you ten thousand dollars, and you can keep the stuff, and I will put you in the way to make many a dollar hereafter.' I asked him

how it was to be done, and he said, 'In the smuggling business.' He was in the business right along, and he would put me in the way of making many a dollar. He said in twenty minutes he would have the money (ten thousand dollars) here." This is the fullest statement of what Henry Kennedy said on that occasion. He was not arrested. Officers Smith and Metzler testify that they each had a short interview separately with him, and that he made similar, though briefer, statements to them. And Metzler says Kennedy said to him at that interview, in response to an intimation that he would get himself into difficulty, "Well, I have all that I have got, invested in that boat." As there is no contradiction to this testimony of Officers Egan, Smith, and Metzler, and Henry Kennedy did not see fit to take the stand, and he was not called by claimant, I find that these conversations took place as stated.

There had been no communication between Henry Kennedy and the two captives, James K. Kennedy and McDermot, or either of them, after the capture of the boat and arrest of the men, and before this communication between Henry Kennedy and the officers, or afterwards, during that night. Egan and Smith were state police officers, and not United States officers, and had no authority from the United States, or otherwise than such authority as they had by virtue of their said offices, to make said capture or arrest.

The said opium was sent to the city hall of San Francisco, and there detained till some time during the day-time of January 4th, when it was reported and turned over to the custody of the collector of customs of the port of San Francisco, said delivery to said collector being on the land, and not on the water. Queock Keung Chung, who declared himself a judge of the matter, examined one of the five-tael boxes captured, opened it, and smoked some of the opium, and pronounced it Lai Yuen opium, manufactured at Hong Kong.

The foregoing constitutes the facts as shown, and the testimony on the doubtful points as first presented, by the government in the district court. To meet this case, the claimant proved certain facts, and introduced evidence to establish others, which I shall now proceed to briefly state:

There was a strict watch kept on the steamer by government watchmen, both night and day, at all times after her arrival. The night-watch was, ordinarily, regularly changed at 12 midnight, though, when the members of the second watch arrived, they generally relieved the prior watch then, even if a few minutes before midnight. On this particular night, the ship having been nearly discharged, two special extra watchmen were supplied at the steamer; but, it being too rough to be safe, no lookout boat was stationed outside the steamer, as was ordinarily done. On the night of January 3d most of the watchmen, if not all, were relieved before 12 o'clock, at various times from 11:20 to 11:30 P. M., as their successors from time to time came along. If the opium came from the Tokio, it was mostly, if not wholly, loaded before midnight, as the boat was first seen at latest but a few minutes after 12 M. The transactions in removing the opium, if removed from the Tokio, occupied a part of two watches. There were seven men on each watch, two of them stationed on the deck of the vessel, one forward and one aft, and the others at various places along the dock opposite the vessel, and in positions to have that whole side of the ship in view.

All the men on both watches were examined as witnesses, and each testified that he did not see anything leave the ship; that he did not see the boat around the ship; and that the opium was not taken from the ship with his knowledge. The witnesses on the deck also testify that they did not see either the police boat or the captured boat pass the stern of the Tokio in going down or returning, till it got some distance past it on the return. One of them, at least, the man on the after-part of the Tokio's deck, ought to

have seen them, and perhaps the one on the forward part; but the others were not stationed in such positions that they would be likely to see them. Egan and Smith also state that they were hailed from the deck of the Tokio when they passed on the way down; but these watchmen testify that they heard no one hail any boat passing the ship. They testify that they kept faithful and careful watch; that they did not hail the boat, or hear anybody else hail it. The watchman on the after-part of the deck is the only man shown by the evidence whose duty it was to be in a position, or who, at that time of night, was likely to be in a position to hail the passing boat in the position it was stated by Egan and Smith to have been in; and he states that he did not hail it, or hear any one else hail it, or see either boat pass down. He ought to have seen them, unless the roughness of the bay and darkness of the night prevented. But if he did see them, or hail them, it is not apparent what motive could exist to falsely deny it, even if, as is suggested by the government, he was in complicity with the alleged smugglers. It certainly would have much better comported with the theory of the claimant to not only have admitted, but to have insisted, that the boats did pass by from Main-street wharf. That is the theory upon which the claimant's case rests; and if perjury was committed, it might better have been in that form than in the one adopted.

In addition to the night inspectors or watchmen, there was a searching force of three men of several years' experience each, the captain of the force having been six years in the business. They all testify that they thoroughly searched the ship for smuggled goods in every part, so far as it could be done without moving freight about to see what might be under it; that this search commenced on the day after the arrival of the ship, and continued from day to day down to the time of the seizure; that, although absent on some days, they were there, from time to time, during all of the time while freight was going out, to see what went out, and then examine the parts of the ship that had been discharged; that at the time of the seizure all of the freight had been discharged except a portion of the freight in the forward hold, and that that part of the ship had been searched so far as was practicable without moving the freight; that heretofore they had never found opium under other freight. It was expected that all the remainder of the freight would be discharged by 10 A. M. of the next day. It was not pretended that the searchers were there all the time, but it was claimed that they were there sufficiently to make a thorough search of the entire ship so far as was practicable without removing freight. The captain of the searchers says there was "no part of the ship but what we examined thoroughly; that is, that we could search, of course. Where the freight was, we could not search that." And he says he searched with the "incentive of a reward ahead in case of success." The other searchers testify to the same effect, and that they did not find the opium. There is no direct testimony to the contrary as to the search or its extent. As showing the incentive to diligence referred to by these witnesses, and as indicating the interest and bearing upon the credibility of Officers Egan and Smith, it may be observed, in passing, that, under the act of 1874, (1 Supp. Rev. St. 77, § 4,) the secretary of the treasury is authorized to allow a reward to "*any officer* of the customs, or *other persons*," who shall detect or seize any smuggled goods, not exceeding in amount *one-half of the net proceeds.*

One B. K. Sheridan, owner of an express wagon, testified on behalf of claimant that on the evening of January 3d he hauled two loads of packages like those seized, making about 100 in all, from the store of Tai Hung & Co., a Chinese mercantile firm, No. 1014 Dupont street, for James K. Kennedy, the claimant, to the foot of Main street, corner of Main street and the water front, near Bryant street, shown on the annexed plat. He stated the facts in detail, and minutely. He said, by previous arrangement he went to 1014 Dupont street, arriving a little after 7 P. M., where he found claimant, James

K. Kennedy, waiting on the sidewalk; that he had a covered wagon; that a Chinaman, Choy Lum, assisted by another, brought the packages out, and he arranged them in the wagon; that, after putting in his wagon about 50 packages, he judged, without counting them, Kennedy got on the seat with him, and he drove to the water front at the foot of Main street, at the corner of the Bryant-street front, a few feet from a small building, supposed to be the wharfinger's office, where he passed the packages out to Kennedy, who lowered them down by a rope and hook on it to somebody in a boat under the wharf; that, after thus passing them down, he returned for the second load, when the same Chinaman, Choy Lum, and another, brought out the remaining packages, and he loaded them in the same way, when the Chinaman, Choy Lum, who brought him the packages, rode down with him to the same place, where he passed them out to the Chinaman, who let them down from the wharf to Kennedy and another man in the boat below, in the same manner as the first were lowered by Kennedy; that two rolls of silk were also carried down in his wagon on one of the loads.  He testifies that he arrived the second time somewhere from 10 to half past 10 o'clock; that he thought he did not carry quite so many packages at the last load as at the first; and that there were about a hundred in all.  He states that he then returned, the Chinaman riding back with him to Montgomery avenue, where the Chinaman got out, near the Commercial Hotel, and he went to his stable and put up his horse at No. 2333 Taylor street.  He testified that he had hauled similar packages for Kennedy, some six months before, from the same place to the foot of Mission street, to be put aboard a packet for the Sandwich islands; that he understood those packages to contain opium, to be shipped for the Sandwich islands; and, as those hauled on January 3d were similar packages, and hauled under similar circumstances, he supposed they were opium; but Kennedy did not state to him that they were opium.

In the district court neither the claimant, Kennedy, McDermot, nor the Chinaman, who are alleged to have aided in loading and unloading these packages, was examined to corroborate the testimony of Sheridan.  On the other hand, a witness was called who testified that he slept at Sheridan's stable on the night of January 3d; that the stable was locked, and he had the key; and that Sheridan could not have had the horse and wagon out, and used it, as he had stated.  But there were such inherent elements of weakness in the testimony itself, when taken in connection with other testimony, as to his habits and whereabouts at about the time, being some two months before he was examined, and such manifest ill-feeling and desire to punish Sheridan for imputed injuries, that the district judge attached no importance to it, and I reject it also as wholly unworthy of credence.

As to the testimony of the other three witnesses referred to by the district judge, who testified to Sheridan's spending the whole evening of January 3d, more than two months before, at a free concert saloon, which the district judge did not wholly discredit, I entertain a different view.  After carefully considering their entire testimony and the opposing testimony on the point; the character and habits of the men, as disclosed by themselves; the glaring inconsistency of some of their testimony; and the manifest inherent improbability of their story in the most important particulars, and the more probable counter-testimony,—I am unable to attach any importance to it.  Whatever the truth may be as to Sheridan's hauling the packages as he states, I am not satisfied that he was at the saloon mentioned on the night in question.  He had never been seen there before or afterwards by these men, who said they were there every night; one of them saying he had not missed a night for a year and a half.  On the contrary, I am satisfied, from a careful consideration of all the testimony on that point in all its bearings, that he was not there; and I so find.

Upon opening the tin boxes of the seized opium, wrapped in matting, each

large tin box was found to contain pieces of San Francisco newspapers of recent dates,—dates so late that it is impossible that they should have been put in in China. They must therefore have been put in either on shore in San Francisco, or on the steamer after her arrival at San Francisco, and the tin covers afterwards soldered on, and the cans then packed in matting, sewed, and bound. The tins were *old*, but the covers *new*, and *newly* soldered. There are two factories at Hong Kong, as shown by the evidence, manufacturing opium: one known as Lai Yuen, and the other Fook Loong. The opium seized is put up like these two brands of opium, in similar boxes, with apparently similar labels, either genuine or attempted imitations of the genuine labels. The smoking opium made at those factories is manufactured of India or Patna opium. The evidence points to no other factories or kinds of opium made in Hong Kong. Considerable quantities of smoking opium have been, and still are, manufactured at San Francisco and in the eastern states. The smoking opium made in San Francisco and in the eastern states is made entirely from Turkish or gum opium. The Turkish or gum opium contains a much larger proportion of morphine than Patna opium. The prepared opium manufactured in the United States is put up and labeled so as to resemble prepared opium imported from Hong Kong, and is often put up in the old boxes of the imported article. Imported opium is required by law to be stamped, but it is not necessary to stamp domestic opium. The government, however, furnishes stamps expressly prepared for the purpose, on application, for domestic opium, and these are frequently, but not always, used as a convenient mode of protection from suspicion and annoyance. The laws of the Sandwich islands absolutely prohibit the importation of opium, except by the board of health for medicinal purposes, under heavy penalties, and even make it a penal offense to have it in possession, except for medicinal purposes, under clearly-defined regulations. Opium, duty paid, at San Francisco, was worth $12.50 to $12.75 per pound, and would sell in Honolulu for from $25 to $30 per pound, and sometimes even higher,— even at times as high as $60. Hong Kong opium is higher in San Francisco than domestic opium. There were 40 men, in the aggregate, at different times, employed by the custom-house in looking after the Tokio while in port. At Honolulu the custom-house force does not exceed four men in all, as appears from the testimony of the Hawaiian consul; and the consul has reason to believe that considerable opium is smuggled from San Francisco into Honolulu, and that it is done both by sailing vessels and steamers. There was no custom-house watchman over the City of Sydney on the night of January 3–4, 1882, there being only the single watchman of the steamer on duty; and the water on the sheltered or westerly or port side of the steamer was comparatively smooth, as contrasted with the water on the eastern side of the Tokio.

Miles A. Short was employed on the City of Sydney as a water tender in the engineer's department, and joined the ship on January 1, 1882, which was advertised to sail on January 14th. Short testified that he had an arrangement with James Kennedy "to take some stuff on board the City of Sydney, and stow it away for him, and keep it in my [his] charge until I went to Honolulu and delivered it to him." And it was to come at 12 o'clock; between 12 and 1 o'clock,—somewhere about that time,—"and Kennedy was to be there the night of the third, or morning of the fourth, about that time." He testified that he (Short) was there at the time, for the purpose of receiving the stuff, and saw two boats pass by the stern of the Sydney; that he arranged with Kennedy to take the stuff in through the coal port on the port side, and that he opened the port to take it in at about half past 11 o'clock; that he was to get a dollar a pound for assisting Kennedy; and that he had several times smuggled opium into Honolulu before on the steam-ship City of New York, the companion ship of the Sydney. Kennedy was to go on the steamer to Honolulu.

On March 16, 1882, a Chinaman approached at the proper window of the post-office at San Francisco, with a sealed package in his hand, had it weighed by the clerk to ascertain the proper amount of postage, purchased the necessary stamps, and was about to affix them and deposit the package in the post-office, to be carried by the mail about to leave for China, when he was arrested by Officer Lynes, by the direction of the United States attorney, who was present, and the package taken from him. The package was duly sealed and addressed, "Messrs. Tong Tang Wo. No. 1 Bornhan, Strand street, (corner,) Hong Kong, China; per steam-ship Oceanic." On the corner was printed, "From Kwong Hon On & Co., 736 Commercial street, San Francisco." The package, being opened, was found to contain several letters, each in a sealed envelope, in Chinese language, and written and addressed by various parties in San Francisco to various parties at Hong Kong. Among these letters was one written in broken English, and sealed up in a separate, smaller envelope with another brief letter in Chinese, and addressed on the outside, "Charley, Hong Kong." The following is a copy of this letter, and the signature is shown and admitted to be that of one Joseph Goetz. The letter is as follows:

"SAN FRANCISCO, March 16, 1881.

"*Friend Charley:* This time Oceanic come again, but Murray not come; he sick, and can do nothing about the trial in court about the opium; it will be decided in a few days, and in our favor, as I expect so, and everybody the same. I am sorry you did not get the telegram from here to stop the letter to that bith, in account of the trouble of Tokio. I did not want it delivered, but can be helped no; all I wanted for Harkins not to no anything about, but I think she will tell Hennessy about it as soon as the case is decided. I will go to Europe and bring the children bak whit me to San Francisco. This is about all, about the money to is over there on my account. James Kennedy will give you particulars what to do whit my return of Tokio, perhaps he will order the money to return, or give it to Henry Kennedy, so must be prepared for it in case that should be so. And about our account, everything is all right, only you charge me for the draft one dollars, and so on every time latley, and don't want this for you to charge so. I will send you my accounts, and I want you to correct it, total, $15,871.33, this include Murray money for the opium ho was bought and return to you again. About the Carpenter money, I don't no yet, but I will see before this letter is close what he intends to do. This is about all; and as I said before, the busines looks bad at present, and the only change is now to do the cargo busnies here, but there must be one house ho imports some goods every steamer, and everything will be all right, so you can think about it, and if you like, you can send some goods right on, consigned to some name a few steamers ahead of it, before sending any stuff. This is about all. I hope this will find you in good health, the same I am at present myself. Yours truly, friend,

"JOSEPH GOETZ.

"N. B.—Write to me in Europe; you no my address, if you have any news for me."

The following was written by James K. Kennedy on the same sheet following the preceding:

"*Charley*—DEAR SIR: You will please pay the carpenter back his money that he paid for the stuff, if he wants it, and if he wants to take it in stuff give it to him aneway he may want it.

"Give my regards to Oh Yep, and oblig me,    JAS. K. KENNEDY.

"P. S.   Carpenter will present a card from me.    J. K. K."

Goetz's note was left with the Chinese firm, who inclosed the letter in the package to be mailed. It was left unsealed, in order that Kennedy might see

it, and append anything he desired, and Kennedy was notified of the fact; whereupon, he went to the store and wrote the paragraph signed by him. He was aware of the contents of Goetz's letter. There is no evidence that Kennedy knew anything of the contents of the Chinese letters, either the one inclosed in the smaller envelope, with his own and Goetz's, or those separately sealed and addressed, and found in the large general package; but evidently he did not as to the letters not inclosed with his.

The Chinese letter inclosed in the same small envelope with Goetz's letter, being translated, is as follows:

"Jim Kennedy said last trip, Murray brought the 100 pounds of opium. Of course, send them on return of steamer. Murray took sick; not come on this steamer. The *carpenter* of the steamer, I don't know his name, goes to Hong Kong, and if he wants one hundred pounds let him have it, and help buy it, and deliver it to him; or if he wants the money back, deliver to him also. He has a *ticket from Jim Kennedy as a proof*. If you see the ticket deliver to him all right.

"*This year, 1st month, 28th day.*                     Brother,
                                        "WOO CHING."

Various tests were made in the district court by experts, to determine the character of the opium seized. Mun Tong examined nine boxes by applying smoking and burning tests. Of these, four were Hong Kong boxes, furnished by the government, and five were taken by permission of the government from the seized opium. In every instance he distinguished the seized from the imported opium, and declared that the seized was domestic opium. He was afterwards put to a severe test before Commissioner Hoffman. Sixteen boxes, each being carefully wrapped so as to conceal the labels and boxes, and leave nothing but the opium exposed, were tested. Ten of them were of the seized opium; five genuine Hong Kong opium, furnished by the custom-house; and one of admitted San Francisco manufacture, not of the seized lot. The test occupied several hours, three separate smokes being taken from each box, making 48 smokes in all. He determined 15 out of the 16, declaring which was domestic and which was Hong Kong, and only failed on one. Chow Suey also made several successful tests in the same way. Some other witnesses making similar tests were not so successful, making mistakes both ways, their testimony being about as favorable to one side as to the other. So, also, 20 boxes of the seized opium were selected at random and marked, and 20 of the imported furnished by the custom-house selected and marked. They were placed promiscuously on the table, and up so as to expose the top only. The Chinese experts rapidly selected and separated the Hong Kong from the seized opium without a single mistake in the 40 boxes, claiming to detect them by the difference in the labels, the imitations not being close. A similar successful selection was made by arranging them so as to expose the side labels only. Mr. Van Duzer, the assistant United States attorney, also separated them by the appearance of the boxes and labels, claiming that he did it from the *newer* appearance of the labels in the seized lot. Mr. Van Duzer, in his printed brief, says: "I relied on the new appearance of the labels and boxes, and had no difficulty in segregating them." If so, this would indicate that the labels had been recently put on here, or on the way, and had not been much handled, thus tending to support claimant's theory. It would seem to be something of a feat to secretly paste three labels on each one of 4,000 boxes necessary to be concealed during the voyage from China, or during the nine days while the steamer lay at the wharf, with three government searchers—unless acting in concert with the smugglers—on the watch, and afterwards pack them and solder them up in 200 larger tin cans containing the late newspapers, and then pack them in matting, such as the packages were when seized. The seized opium was packed in *old* 10-pound tins, with new covers

soldered on.  The several searching officers on the Tokio testified that, in their opinion, it was not possible for a ton of opium to be concealed on the Tokio, taken out of its place of concealment, and soldered up on the Tokio during the time that ship was in port, without being discovered; that there was no place on the Tokio where the soldering could be done without discovery; that fires were not permitted on the Tokio while in port; and that it would be impossible to carry the large tin cans used aboard the ship without discovery, there being officers, men, and watchmen at all times on the deck and the ship.

The foregoing, so far as it purports to state the facts, are the facts established by the evidence; and where the evidence is stated as evidence, the substance of the important evidence in the case, as it was presented in the district court.

The claimant, as we have seen, produced testimony to show that the opium seized was taken from the store of Tai Hung & Co., at No. 1014 Dupont street, carried to the foot of Main street, and loaded in the boat; but there was no effort to trace it beyond that, or to show the particular place where the opium was in fact prepared.  It was shown that opium was manufactured at San Francisco from Turkish opium, and also at Newark, New Jersey; and witnesses testified, from the looks of the opium, and from testing it by smoking, that, in their opinion, it was San Francisco made smoking opium, prepared from Turkish or gum opium.  Beyond this general opinion the claimant did not attempt to go or to trace the opium, and it was in consequence of this failure to show where and by whom the opium was manufactured; from whom the crude opium was obtained, etc.; and because other testimony, presumably within the claimant's power, corroborative of Sheridan's statement, if true, was not produced,—that the district court found against the claimant, and condemned the opium, as appears by the opinion of the judge; reported in 8 Sawy. 140, 141; S. C. 12 Fed. Rep. 402.

In this court much testimony upon these points, where proof was wanting in the district court, was introduced.  The claimant, James K. Kennedy, himself appeared as a witness.  He testified that on the evening of January 3d, at about half past 7 o'clock, Sheridan met him, by previous arrangement, at No. 1014 Dupont street, where a part of the seized opium was loaded into Sheridan's express wagon, —a little more than half, he thought, but he did not count the packages;—that the packages were passed out of the store of Tai Hung & Co. by Choy Lum and Choy Suey, he (Kennedy) standing in the door of the store at the time; that he directed Choy Lum to go down with the next load, and then got on the wagon himself, having the two rolls of silk, with Sheridan, who, by his direction, drove to the foot of Main street, at the corner of Main street and the water front; that upon arriving there, Sheridan passed the packages out of the wagon to him, and he let them down to McDermot, who was in a boat under the wharf waiting for him by previous arrangement, by a rope and hook, when McDermot received them and stowed them in the

boat, after which Sheridan went back to 1014 Dupont street for the other load; that he (Kennedy) then slid down a pile and got into the boat, where he and McDermot arranged the packages already in the boat, and then awaited the return of Sheridan with the remainder; that in due time Sheridan returned with the other load; that Choy Lum, as he had before directed, came with him; that Sheridan passed the packages out of the wagon to Choy Lum, who let them down to him by the rope and hook, who received them, and McDermot stowed them away; that after unloading Sheridan and Choy Lum left in the wagon together; that they got through somewhere about half past 10 o'clock.

Choy Lum testifies to the transaction in all material particulars, giving precisely the same account of what transpired as that given by Sheridan in the district court, and Kennedy in this court, and stated that he counted the packages as they were loaded, and that there were 55 packages and the silk in the first load, and 45 in the second. He stated that he went down with the last load by Kennedy's directions, then returned with Sheridan to somewhere about Pacific street on Montgomery avenue, where he got off and went home, while Sheridan went in the direction of his stable; that he got to the store about half past 11,—the testimony corresponding fully with that of Sheridan and Kennedy. He also says that he was aided in passing out the packages from the store to Sheridan by Choy Suey, his brother and partner. Choy Suey gives precisely the same account of what took place at the store as that given by the others: that the first load contained 55 packages, and the second 45; that his brother, Choy Lum, was directed by Kennedy to go down with the second load, and he went, returning about half past 11. McDermot gives the same account as the others as to the unloading and passing down of the packages into the boat. He states that he knew Sheridan, and, although he did not see him, being under the wharf, he recognized his voice, and said: "Hallo, Tom! Is that you?" Sheridan, Kennedy, Choy Lum, Choy Suey, and McDermot agree in their testimony as to obtaining and loading the seized opium at 1014 Dupont street, and unloading it and passing it into the boat at the corner of Main street and the water front. This testimony is consistent in itself, and, independent of any other testimony affording a contrary inference, contains no apparent inherent improbabilities. To discredit this statement, a man is called who testifies that on that night, from about dark till after midnight, he was stationed as a watchman on a vessel lying on the other side of Main-street wharf, about 100 feet from the water front; that it was also his business to keep a lookout for a lumber-yard, situate on the north-west corner of Main and Bryant streets, diagonally across the wharf and street, and to do so he had to look from his station on the vessel across the point where Sheridan is said to have unloaded the opium; and that he did not see any wagon there, or anybody unloading opium, or otherwise. He did not

leave the vessel, but not only watched the vessel, but also the lumber-yard from the vessel at a distance. Kennedy and McDermot both testify that they remained under the wharf till about half past 11 o'clock, when, by the direction of Kennedy, they started from their place of concealment, and pulled for the City of Sydney, for the purpose of putting the opium aboard the Sydney; that they pulled out, passing the end of Beale-street wharf, then past the stern of the Tokio, which, according to the plat and scale, is from 665 to 670 yards, or more than a third of a mile, from the starting point. They testify that at no time going out were they within 100 or 150 feet from the Tokio; that, owing to the wind and the tide, after passing the Tokio, they made a larger circuit than would otherwise be necessary, and then turned in and rowed directly for the Sydney; and when within 30 or 40 feet, more or less, from her, (amidships,) they were captured; that they did not see the pursuing boat until they had turned in, and were pulling directly for the Sydney. In going back, both Kennedy and McDermot state, and the officers Egan and Smith admit, that they passed so near the Sydney that their oars touched her stern, Egan and Smith saying in consequence of the space required to turn round in. As to what took place at the capture, and afterwards, there is but little discrepancy between the testimony of the parties and that of the officers. The only material difference is in the language used by Kennedy, and what he meant. It is not quite so strongly stated by them as by Egan. Kennedy testifies that when Egan said he was going to take them to the station-house, he told him "to take it, and let us go;" that "I meant that we should go with the stuff, of course;" "that they should take it along with us to the station;" and McDermot said that he heard no such remark as, "Good God, you are not going to arrest us! We are men of families," etc. They state that they did not see the pursuing boat until they had passed the Tokio and turned in, and were pulling directly for the Sydney; that they heard the oars of the other boat before they saw the boat. And Egan and Smith admit that the captured boat had turned back before it was overtaken.

Kennedy testifies that he bought all this opium through Tai Hung & Co., at 1014 Dupont street, in five different lots of 400 pounds each, at five different times through the month of December, 1881; that he did not know of whom Tai Hung & Co. purchased the first lot till after it was purchased, but he then ascertained that it was purchased of Hop Kee & Co., another Chinese firm, and that when the subsequent orders were given to Tai Hung & Co., he knew they expected to get it of Hop Kee & Co.; that Tai Hung & Co. bought it in large packages, packed the opium in small boxes, labeled it, then put it up in larger cans, and then in packages, as it was found when seized, in accordance with his instructions; that he purchased of Tai Hung & Co. because he could get it fixed there just as he wanted it, and he only knew Hop Kee by reputation; that he furnished the newspapers

and had them put in the large tins to keep the small tins from rattling, and also to have it as evidence in case he should want it. These newspapers all bore date so late that it was impossible that they could have been put in before the steamer arrived at San Francisco, some of them bearing date the day before the arrival of the steamer; that he did not know there was a private stencil-mark of Tai Hung & Co. on the back of the label, as it afterwards appeared there was, on each box.

Kennedy further testified that he furnished the money to Tai Hung & Co. to pay for the opium, from time to time, on each occasion, as it was purchased; that he borrowed $10,000 of this money for the purpose from Joseph Goetz, the party whose name appears in other connections in this case, but that Goetz had no interest whatever in the opium, he (Kennedy) being the sole party interested in it. He also testified that of the money used by him he obtained $3,400 or $3,500 from his brother, Henry Kennedy, before he went on his last trip to China. In corroboration of Kennedy, Choy Lum testified that he had for over three years been a merchant, dealing in opium, dry goods, and general merchandise, at No. 1014 Dupont street; that he was a member of the firm of Tai Hung & Co., composed of himself and his brother, Choy Suey; that on December 2, 1881, he sold to the claimant, Kennedy, 4,000 taels domestic opium,—that is, opium called gum or Turkish opium, prepared in the United States; that he bought it of Hop Kee & Co.; that when he bought it, it was put up in large tins, like coal-oil cans, containing 200 taels each; that Kennedy directed him to put it up in small tins containing 5 taels each, and then to put them up in 100-tael tins, or 20 small 5-tael boxes in 1 tin; that he put them up as directed, using old boxes, from which he soaked and rubbed off the labels, and put on new ones, and put 20 of the small 5-tael boxes in 1 tin can; that one Ah Hock, a Chinese tinsmith, soldered on the covers; that he cut the covers out of new tin himself; that he packed two of the large tins. together in Chinese matting, sewed the matting, and then tied it with bamboo splints; that, by the direction of Kennedy, he put pieces of newspapers furnished by him in each large tin; that it takes four to five days to pack up 400 pounds, or 4,000 taels, in this way; that he paid for it before taking it away with money furnished by Kennedy; that after this lot Kennedy ordered 4,000 taels more, which were bought and put up at his store in the same manner until he had given five orders of 4,000 taels each, so as to make up 20,000 taels; that all were purchased, paid for, and put up in the same manner; that all, except the last order, were filled by purchases of the same kind of opium of Hop Kee & Co. But on the last order Hop Kee had only 2,000 taels, and he bought the remaining 2,000 taels of Tuck Kee, another Chinese firm; that the opium bought of Hop Kee & Co. was in large coal-oil tins, containing 200 taels each, but the 2,000 taels bought of Tuck Kee was already put up in five-tael boxes, but with-

out labels on them; that all bought of Hop Kee he put up in the same manner at his store; that, after putting the opium in five-tael boxes, he put on the labels, some in imitation of Lai Yuen and some of Fook Loong; that he also put the labels on the 2,000 taels bought of Tuck Kee, which had been put up in five-tael boxes before he purchased it, but had not been labeled.

The labels consist of two red labels and one white one, corresponding in width and length with the sides of the box to which it is attached, put on three sides of the five-tael boxes. He testifies that he had stamped on the back of the label on each—on the side pasted next to the box, near the bottom—the words "San Francisco," in printed letters. In reply to a question by the United States attorney he said he had the stamp with which he so stamped the labels at his store, and he could produce it. By direction of the United States attorney he produced in the afternoon a piece of India rubber with the words "San Francisco" formed on it, with materials for stamping, and stamped with it similar labels produced by him. Upon moistening the labels on the boxes seized in question, and turning them up, each label was found to be stamped, as Choy Lum said it was, with the words "San Francisco," exactly like the one made with the India-rubber stamp produced. So, also, the genuine Lai Yuen and Fook Loong opium boxes produced in evidence have each impressed upon it a peculiar Chinese character, about one-half an inch wide by three-quarters long, a little longer on the Fook Loong than on the Lai Yuen, stamped with a die in the tin cover of the box.

The seized opium outer tins had similar stamps, apparently corresponding generally with the respective stamps of the kind of opium represented. Choy Lum presented two steel dies, exactly corresponding with the dies used in stamping the seized opium outer tins, with which he said he stamped those tins. He stamped pieces of tin with them when testifying, which were put in evidence. An engraver was examined, who used a magnifying glass to inspect the stamps, and he measured the respective impressions, and pointed out very marked differences between the impression on the seized opium tins and those made by the dies produced corresponding with them and those on the genuine opium, showing that those on the seized were not the genuine stamps of the manufactory. So, also, Choy Lum stated that the labels on the seized opium were not the same. There were decided differences in the characters, though generally resembling each other in appearance; and there were also differences in the shades of the paper, the red Chinese paper being brighter, and the white lighter, than that used here. He also produced wooden engraved blocks upon which many of the labels on the seized opium were said to have been printed, and labels were printed from them corresponding with those on the tins. He testified that similar labels were printed here in large numbers, and his testimony was corroborated by printers who had printed for him and others.

Choy Lum testified that he put on all the labels and marks and the words "San Francisco" himself. Some were marked and labeled "Fook Loong," and some "Lai Yuen," about 9,000 taels being marked and labeled "Fook Loong;" that his partner and nephew helped pack and label the opium. Choy Suey, brother and partner of the last witness, gave precisely similar testimony upon all these points; and Gu Ah Hock testified that he, at Tai Hung & Co.'s store, soldered on the covers of the tins, containing 20 small boxes each, with pieces of newspaper in them, at the several times of the purchases in December mentioned. Upon cross-examination and demand of the United States attorney, Choy Lum hunted up and brought into court what purported to be the receipted bills for the five lots of opium claimed to have been purchased from Hop Kee and of one lot of Tuck Kee, which corresponded in dates and all other particulars with the facts as before testified to by Choy Lum. They appeared on their face to be in all particulars bills made in the regular course of business, with nothing intrinsic in the papers, or the testimony of the witness in regard to them, to throw discredit on them. The following is an example, as translated in the evidence:

"Tai Hung & Co., bought of Hop Kee & Co., domestic opium, 4,000 taels, $0.85 a tael.
"Rec'd payment in full.
"*Dated December* 4, 1881.
[Stamped] "HOP KEE & Co."

These bills of Hop Kee bore date, respectively, December 1, December 4, December 12, December 24, and December 29, 1881. Choy Lum testified that these receipted bills were received at the time they bore date, and when the opium was purchased, in the regular course of business; and a member of the firm of Hop Kee & Co. testifies that his firm sold the opium to Tai Hung & Co., as stated by the members of that firm and in the several bills in evidence, and that these are the genuine receipted bills given at the time of the transactions, and at the respective dates they bear. And Wy Noon, of the firm of Tuck Kee, testified that his business was the manufacture of domestic opium; that on December 26th he sold to Tai Hung & Co. 2,000 taels opium prepared by him, put up in five-tael boxes, without the labels on the boxes; that he made it of Turkish opium bought of Downing & Son, 14 Second street, San Francisco; and a receipted bill bearing date December 26, 1881, was produced by Tai Hung & Co., which he stated was the same bill delivered at the time.

It was proved beyond all ground for controversy that Hop Kee & Co. had a manufactory of prepared opium at Newark, New Jersey, prior to 1880, which was closed up about the last of December, 1879, or first of January, 1880; and I so find the fact to be. This appears by uncontradicted evidence as well as by reports of the United States revenue officers of that district. It is not denied by the United States that it was in existence and operation to that date, and it is

not claimed by claimant to have been in operation since. Smoking opium was prepared by this firm out of Turkish or gum opium, purchased from Lanman & Kemp, well-known druggists, in New York city. It also appears beyond all doubt, and I so find the fact to be, that in February, 1880, there were 25 packages or boxes, each inclosing 2 large tin cans about the size of coal-oil cans, containing each 40 pounds of prepared opium, or 2,000 pounds in the aggregate, shipped from Newark, New Jersey, through Lanman & Kemp, of New York, from whom the crude opium had been purchased, to Downing & Son, San Francisco, to be delivered to Hop Kee & Co., upon the payment of certain charges, which charges were paid, and the packages delivered by Downing & Son to Hop Kee & Co. Choy Lum produced a box, and the cover of another, as a box and cover of another box in which he bought some of the opium in question of Hop Kee & Co., the cover having parts of seals of Hop Kee & Co. put on at Newark, and the cover having the address to Downing & Son and other marks stenciled or printed on it, which were identified by a member of the firm of Downing & Son and by the drayman who hauled the packages from the railroad office to Hop Kee & Co., as being one of, or at least wholly like, the boxes so received by Downing & Son for Hop Kee & Co., from Newark. Of the fact that Hop Kee & Co., in February, 1880, received 2,000 pounds of prepared opium from Newark, through Downing & Son, there can be no question on the evidence; and I so find the fact to be.

Loo Gee Wing, one of the members of the firm of Hop Kee & Co., also testifies that at the time of the receipt of said 25 boxes in February, 1880, Hop Kee had on hand 6,000 pounds of opium prepared at Newark, making in all, including the 2,000 pounds received through Downing & Son, 8,000 pounds. He also testified that the 18,000 taels, or 1,800 pounds, of opium sold by Hop Kee & Co. to Tai Hung & Co. at the several times in December, 1881, for claimant, Kennedy, was what remained of the said 8,000 pounds of opium manufactured at and received from Newark, New Jersey. And Choy Lum testifies that to make up the 20,000 taels wanted by Kennedy he bought of Tuck Kee 200 pounds, or 2,000 taels, manufactured by him at San Francisco. There is no direct evidence to contradict any of this testimony as to the sale of so much opium by Hop Kee & Co. to Tai Hung & Co., or that it was not the remnant of the opium prepared by Hop Kee & Co. at Newark; but it appears that Hop Kee & Co. had borrowed of Joseph Goetz, the same party whose name appears in other parts of the testimony, some $6,000, upon which they were paying interest. And it is insisted by the United States attorney that it is highly improbable that such would be the case while they were carrying $20,000 worth of opium which could at any time be disposed of. On the other hand, it is insisted that business men might well think it better to pay interest and carry stock for a better market. It is also shown by the testimony that some one, probably

Loo Gee, acting on behalf of Hop Kee & Co., made a statement to the assessor, for the purposes of taxation, in March, 1881, in which the word "opium" had been written, and afterwards erased, from which it is argued that the firm had no opium in March, 1881; and as they went out of that business and of the manufacture of opium in San Francisco not long after that date in that season, they could not have had any on hand, and especially of Newark manufacture, at that date, and consequently none to sell to Tai Hung & Co., in December, 1881.

It was shown by the records of the custom-house that Hop Kee & Co. had obtained stamps for domestic opium prepared *at Newark*, from November 19, 1879, to August 24, 1880, to the number of 5,080, sufficient for 2,540 pounds; and from April 22 to August 25, 1881, for domestic opium, purporting to have been made at San Francisco, to the number of 793, sufficient for 396 pounds of opium. To this is replied that there was no law requiring stamps to be purchased for such opium, and it was optional with the manufacturer whether he would use them or not, it being a matter for his own convenience. No testimony is introduced to show that all stamps purchased are used, or that stamps are in practice purchased for all manufactured, or that stamps are put upon any but such as is put up in small five-tael boxes for retail; while the opium sold in bulk, as this is claimed to have been, to Tai Hung & Co., it is insisted is not stamped; and, there is no evidence that it is stamped in practice when sold in this form in bulk in large quantities. It is also insisted by the claimant that the purchase of a considerable quantity of stamps between April and August, 1881, is conclusive evidence that Hop Kee had opium on hand in the preceding month of March. Hop Kee & Co. then had a manufactory of domestic opium at Newark, New Jersey, prior and down to about January 1, 1880; and also as late as February 24, 1880, the firm had at least 2,000 pounds of the opium prepared at that factory on hand, and if Loo Gee Wing testifies truly, the firm at that time had 6,000 pounds in addition, making an aggregate of 8,000 pounds then on hand. There is no intrinsic improbability that his testimony on this point is not true, and no direct testimony to the contrary. Whether he had 18,000 taels or 1,800 pounds of this opium still remaining to sell to Tai Hung & Co., and whether he did so sell it in the month of December, 1881, must be determined by the direct testimony of Loo Gee Wing, Choy Lum, Choy Suey, Kennedy, McDermot, and such other facts and testimony stated, and inferences therefrom, as bear upon the question, including the Chinaman who says he soldered the tins for Choy Lum. It is a question of credibility to be determined upon all the evidence. It should be stated that the claimant, Kennedy, had been acquainted with Choy Lum over three years, and that they first became acquainted while they were working together on steamers running to China. Goetz also appears to have loaned money to Hop Kee & Co., as well as to

have advanced money to Kennedy to purchase the opium in question, and thus to have had business relations with these dealers in opium, both Chinese and Americans. On appeal, the government introduced testimony to rebut that of Short.

Lisseck, the first officer of the City of Sydney, testified that when the ship was in San Francisco, about the first of May, or some four months after January 3, 1882, he experimented with the coal port, which Short said he opened alone, to take in the opium, to see if it could be done by Short, as stated by him in the district court. Lisseck's evidence was that at that time, to open the port, it required a series of seven or eight heavy blows with a scantling six or eight feet long, and three by six inches in size, making a loud noise that could be heard all over the ship; and that it could not well be opened by one man alone, he always sending another man with the carpenter, whose business it was to perform that duty, to aid him. Three other men, who witnessed the experiment, corroborated his testimony. Some of these witnesses said this port opened to the side, and some that it opened upwards.

There appears to me to be some tendency to exaggeration in these witnesses concerning the difficulty of opening this port. It would seem to require a very heavy steel plate to stand those blows, as described, without injury.

It was said, however, that the port had not been opened for a long time, and the screws were so rusted as to make it difficult to turn the nuts, and that the port was thoroughly packed in India rubber to make it tight. It may well, by long disuse, have become firmly bedded, so as to adhere with greater tenacity at this time than on the third of January, it being four months after Short's alleged opening of the port, although it had doubtless been opened in the mean time.

To rebut this testimony of Lisseck and his associates, offered by the libelant, one Coutts testified on the part of claimant, who said he engaged as ship-carpenter on the Sydney on the voyage succeeding January 3d; that he entered upon his duties as such either on January 8th or 9th, five or six days after the day when Short says he opened the port; that, it being his duty to do so, he immediately examined the coal ports to see that they were in good working order; that he opened the starboard port without difficulty, alone, giving two or three light blows with what he called a five-pound maul or sledge; that he found already open the port coal port, (which is the one Short said he opened on January 3d or 4th,) and closed it; that he kept the ports well oiled while he had charge of them, and he could open them alone without difficulty; and that they were in good condition when he *first* examined them. Robinson, the superintending engineer, said he thought one man might open the ports, he having a small monkey-wrench to remove the nuts; and another witness said he thought the ports could be opened with a five-pound hammer. It

does not appear who left the coal port open when found open by Coutts. It may have been Short, when he opened it on the third, if he did open it. Such is the testimony *pro* and *con*, with reference to the practicability of opening the port by Short, Short having before testified that he did open it to take in the opium. There was testimony also tending to show the impracticability, and the contrary, of landing the opium at Honolulu during the short stay of the steamer, from 6 to 16 hours.

Dr. Burrell testified that he was a regular graduate in medicine, and was an employe of the government in examining drugs and chemicals at the appraiser's store; that no crude opium is allowed to come into the United States that contains less than 9 per cent. of pure morphia, that being the minimum; that the crude Turkish opium he admits into this port contains from 9 to 18 per cent. morphia; that the only specimen of crude Patna opium, which he analyzed out of curiosity, only contained four and a half per cent. morphia; that crude Patna opium does not come here, as it is not admitted; that he analyzed opium from boxes marked, respectively, "A," "B," and "C," boxes A and B having been seized by the government on the steamer as genuine Hong Kong prepared opium, respectively, June 27, and March 29, 1882, and box C being one of the boxes in question seized January 3, 1882; that box A of the Hong Kong opium contained 4.70 per cent.; box B, 6.08 per cent.; and box C of the *seized* opium, 9.18 per cent., a considerably larger per cent. than even crude Patna opium contains, and large enough to admit it as crude Turkish opium.

In accounting for the presence of Henry Kennedy soon after the capture, the claimant, James Kennedy, testified that he had requested his brother Henry to be at Beale-street wharf on the lookout from 8 till after 11 o'clock of the night of January 3d, and that it was in obedience to this request that Henry Kennedy was on hand so soon after the capture.

I have now stated the probative facts, so far as they are clearly established by the evidence. Where I have stated a fact as a fact, I consider it as clearly established, and so find the fact to be, and not open to question or doubt. On the other points, where there may be doubt, I have stated the salient points of the evidence as evidence, and the substance so far as it is deemed important *pro* and *con*, without attempting to refer to every minute circumstance.

The facts and testimony stated are the controlling facts and circumstances in the case. From the facts found and stated, and the evidence stated on the points open to question, the great controlling ultimate fact: was the opium in question smuggled into San Francisco on the steamer Tokio? must be determined.

It will be seen that there are two theories, and but two, suggested by the evidence and maintained by the opposing counsel. One is that the opium is Lai Yuen and Fook Loong opium, prepared at Hong

Kong, out of crude Patna opium, and was smuggled into San Francisco on the steam-ship Tokio. The other is that it is domestic opium, prepared in the United States, and out of crude Turkish opium, 1,800 pounds of it at Newark, New Jersey, and 200 pounds of it at San Francisco, and that the claimant was attempting to smuggle it into the Sandwich islands on board the City of Sydney. One of these theories must be accepted as true, and the case decided on that principle; for, although it makes no difference on what vessel it was smuggled, if smuggled at all, the *testimony* does not indicate, or even suggest, that it was smuggled on any vessel other than the Tokio, and, if smuggled, that it is any other than Tai Yuen or Fook Loong opium, manufactured at Hong Kong out of Patna opium; and we are not at liberty to depart from the testimony and adopt some other theory or hypothesis not suggested or supported by the evidence. The question to be decided upon the facts and evidence stated, then, is, which one of these two theories is correct? for one or the other must, necessarily, be adopted. Was this opium smuggled into San Francisco on the Tokio? or was there an attempt to smuggle it into Honolulu on the Sydney?

At the outset of the discussion of the questions involved it is necessary to pass upon the admissibility of certain evidence, without which the government cannot possibly maintain this libel. The admission of the acts and statements of Henry Kennedy hereinbefore set out, performed and made soon after the capture of the opium while it was still lying on the wharf, is strenuously objected to on the part of the claimant as being utterly incompetent and inadmissible, on the ground that he is not a claimant, and it is not shown by any testimony, other than his own admissions, or otherwise than as appears by the foregoing, to be in any way connected with the transaction; that he is not shown to have any authority over the subject-matter, and the acts were not performed, or statements made, in the presence, or by the authority, or even with the knowledge, of the claimant, who testifies that he, and he alone, is the owner. It appears affirmatively, by the testimony of the officers who made the capture and arrest, that Henry Kennedy had no interview or communication with James K. Kennedy, claimant, and McDermot, or with either of them, after the capture and arrest, and before the statements and acts offered and objected to were performed and made. What transpired between him and the officers took place probably not far from one hour after the arrival of the captured boat at the Folsom-street wharf and the starting of Officer Smith to the station-house with the prisoner. It does not appear that Henry Kennedy was the man first seen by Egan; if he was, it is not apparent why he did not at once advance to meet Egan, when he found him alone, as he subsequently insisted upon seeing him alone. It may be that this evidence would be wholly incompetent on the trial of an indictment against James Kennedy and McDermot for smuggling this same opium, as being *res*

*inter alios actæ;* but, however that may be in this case, which is a proceeding *in rem* against the opium to condemn it, I think, upon the authorities cited by the United States attorney, these acts and declarations of Henry Kennedy, under the circumstances set out, are competent evidence, and admissible as a part of the *res gestæ*. I therefore overrule the objection and admit the evidence. The claimant duly excepts to the ruling, and the exception is allowed.

The letter of Goetz and the further note appended by Kennedy, set out in the preceding statement of facts, are also strenuously objected to as being no part of the *res gestæ*, they having been written two months and a half after the seizure and arrest, and whatever they may refer to or mean, they are statements respecting past transactions, and are incompetent and inadmissible. The note appended by James K. Kennedy to the letter of Goetz I think clearly admissible as a declaration of Kennedy himself against himself, the claimant of the opium, who himself testified that he alone is the owner. A party's own declarations are admissible in evidence against him, as such, whenever or wherever made, and without reference to whether they constitute a part of the *res gestæ* or not.

The letter of Goetz is on the same sheet of paper, and immediately preceding the appendage made by the claimant, and was left open expressly for Kennedy to read and make such additions as he saw fit; and Kennedy, having been informed of the fact, did read it and make the addition already considered. Both were doubtless intended for the same party, and had some relation to the same subject-matter. I consider, therefore, that Goetz's letter must be considered in precisely the same light as if it were a declaration of Goetz made in the presence of James K. Kennedy, without any comment made on his part, or with such comment as he saw fit to make. Such a declaration, made in his presence, would be admissible, and I think this letter, under the circumstances of the case, stands upon the same footing, and is admissible upon similar principles. As to the letter of Woo Ching, also set out in the statement of facts, I entertain more doubt. Goetz and Kennedy's letter, already considered, was inclosed in the same separate small envelope, and sealed up with this letter. They were, therefore, going to one address, and they were, doubtless, intended to be seen at least by the same party, and they seem to relate to the same transaction. Both this and Kennedy's postscript refer to the carpenter. Kennedy and Goetz both left their letter with the Chinaman, open, with an opportunity to read it, and intended it to be read, sealed up, and forwarded by him, the Chinaman, and they, with reference to these communications, were evidently acting in concert. It is true, Kennedy says he did not see this letter, or know of its contents, or that it was to be sent, and there is no direct evidence, or evidence other than the circumstance stated, to the contrary; but, upon the whole, though with some hesitation, I think it stands upon the same footing with Goetz's letter, and admissible.

To each of these rulings the claimant duly excepts, and the exception is allowed.

The letter of Lee Yue Wye was not in the same envelope with Goetz's and Kennedy's letter, but was a separate, independent letter, like a large number of others, from other parties to other parties, inclosed in one large outer package, a sort of small mail-bag by itself. The writer says the contents were written merely upon hearsay, without any knowledge of the facts upon his part or privity upon Kennedy's part. The claimant is not sufficiently connected with this letter to justify its admission, and it is, consequently, excluded from consideration; but, if admitted, it would add nothing of moment to the force and effect of the others. The observations of McDermot, made to the officer several days after the arrest, were no part of the *res gestæ*, and as he is not a claimant, I exclude them. But they would add little to the force of the testimony, if in, and would not affect the result.

After mature consideration of the testimony and facts in all their aspects, I find it impossible to adopt either of the theories propounded as to the smuggling, and feel *entirely satisfied* that it is correct. Set aside the acts and statements of Henry Kennedy, the declarations made and alarm manifested by James K. Kennedy and McDermot at the time of the arrest, and the letters of Goetz, James Kennedy, and the Chinaman, and it must be conceded, I think, that the evidence would be overwhelming against the government. Even the acts of James Kennedy and McDermot, at the time of the capture, if they stood alone, would not be so specific and definite as to be necessarily inconsistent with claimant's theory. There is no direct, positive evidence, outside of these matters and acts referred to, and the inference to be drawn therefrom, to show that this opium ever was on the Tokio, and no established *other* fact, or direct reliable evidence of any fact, that is not just as consistent with the theory of the claimant that he was attempting to smuggle this opium to Honolulu on the Sydney as that it was smuggled into San Francisco on the Tokio; while the great mass of the direct testimony, whether reliable or not, is directly and positively opposed to and inconsistent with the latter, and as directly and positively supports the former. The boat containing the opium, when first discovered, was just where it would have been if, in fact, after having been loaded at the corner of Main street and the water front for the purpose as alleged, it had started to go to the Sydney to put the opium on board; and its subsequent movements were not inconsistent with that theory. No man testifies to having seen the boat in contact with the Tokio, or near enough to receive the opium, or in a condition to receive it from on board. No man testifies to having even seen any of this opium on the Tokio, or going off from it, although from five to seven men were constantly watching the ship night and day, and three additional experienced men searching her from time to time to find the drug. All these men

on watch, at the time the boat was discovered, together with the men on the prior watch, testify to their vigilance, and that they failed to see the boat in question, or any other, at the Tokio, or anybody carrying the opium off or putting it in the boat.

It is insisted by claimant that in the condition of the weather and the bay on that night it would have been impossible for so small a boat to lie along-side the steamer and receive so large an amount of goods. The bay was certainly rough. Such is the concurrent testimony of all. No expert gives an opinion as to whether it was practicable for a boat of the kind, in the condition of the sea, to lie alongside the steamer on the outside and take on board a ton of opium in the shape shown in the case.

I should myself, from the evidence, in view of the state of the bay, think it far more probable, if the opium was taken on board from the steamer on that night, that it was taken on board on the inside, between the steamer and the wharf, and not on the outside. But this involves the grossest negligence or complicity of a larger number of custom-house officers, for in that case all on watch must have been in such a position that the operation could not fail to have been brought to the notice of each. But, as there is no *direct* evidence as to its being taken on board from the ship at all, we can only infer which is most probable from the facts known. The improbability that this opium could have been taken off from the outside in the known condition of the bay, with the negligence, or complicity, of two watchmen, seems to my mind to outweigh the improbability of its being taken from the inside, even with the gross negligence or implication of all those whose duty it was to prevent it. The inside must have been certainly more practicable than the outside, and it only involves negligence or complicity of a greater number of men. If taken from the Tokio at all, I think it much more probable that it was done from the inside than from the outside. If there was complicity, then there must have been perjury also, and a great deal of it, for all of both watches and the searchers profess to have been vigilant, and to know nothing about the transaction. It is difficult to believe, and distressing to contemplate, the fact of so much official dishonesty or negligence, or both, as must have occurred if this opium came from the Tokio. Besides, there must also have been barefaced, unmitigated perjury on the part of numerous other witnesses. There undoubtedly seems to be difficulty in supposing that it was practicable to get this opium aboard the Sydney in this port, and off again at Honolulu; and the testimony upon the practicability of so doing is also in conflict. But the Sydney, at the wharf in San Francisco, was in smoother water than the Tokio, with no watchman except the single one employed by the ship; and the whole custom-house force at the port of Honolulu consisted of but 4 men, while in this port nearly or quite 40 in number, as shown by the testimony of a superior government custom-house officer, were engaged in the business

of watching the Tokio at one time or another, and not less than half a dozen at all times, and sometimes eight or ten at the same time.

The time is shorter, it is true, at Honolulu, but human nature can hardly be presumed to be much better there than elsewhere; and it is quite as likely to be practicable, in smoother water, with one watchman, and the aid of an acknowledged confederate on board of the Sydney, to elude the vigilance or corrupt the virtue of that one man at San Francisco, and of from one to four at Honolulu, as, with a rough sea prevailing, to elude the vigilance or to corrupt the virtue of the large number of the public guardians placed over the Tokio.

At Honolulu the price of opium, and consequently the inducement to violate the laws and take the risk, is much larger than at San Francisco. Then there is the direct, well-knitted, consistent, compact, concurrent, and homogeneous account given of the purchase of the 1,800 pounds of opium by James Kennedy, through Tai Hung & Co., of Hop Kee & Co., and 200 pounds of Tuck Kee; the putting of it up in small boxes; labeling it with new labels in imitation of Hong Kong labels but different in type and color, with "San Francisco" as a private mark stamped on the under and concealed side of each label found to exist as stated by Choy Lum in his testimony, with a character imprinted on the outer tins with steel dies different from the genuine, supported by a production of what would seem to be the dies, stamps, and wood engravings used to produce them; the packing and soldering up of the small boxes in larger, containing newspapers of dates so late that it must have been done since the arrival of the steamer in San Francisco; the transportation of the opium from 1014 Dupont street to Main street, and loading in the boat, etc., —all this supported by the direct, positive testimony of so many witnesses as to their own personal acts in the premises. All this testimony, taken in connection with the remarkable success of the tests of the character of the opium tending to show it to be of domestic manufacture, and the fact that it contains the percentage of morphia that exists in the domestic article; the established fact that Hop Kee had an opium manufactory at Newark, New Jersey, prior to 1880, and afterwards at San Francisco, and received 2,000 pounds of prepared opium from the former so late as February 24, 1880; and the testimony that the firm then had 6,000 pounds, before received, on hand, besides the difficulty of so concealing and manipulating so large an amount of opium on the Tokio as to give the external appearance it presented at the time of the seizure, and the other facts favorable to the claimant, set out in the statement,—makes a very strong, not to say overwhelming case, when standing by itself.

On the other hand, the government insists that the facts and evidence set out in the statement disclose a body of men systematically engaged in smuggling opium; that the direct evidence as to the purchase, packing, stamping, etc., comes from the very men engaged in this unlawful business, who are largely interested pecuniarily, and

some of them criminally, and it is therefore to be distrusted on those grounds; that parties systematically engaged in smuggling opium, as they admit, to Honolulu, are capable of smuggling into San Francisco, and of defending and concealing their smuggling by the grossest perjury; that the watchmen, searchers, etc., are implicated with them; that all this business of packing, labeling, stamping, dies, etc., except in regard to soldering up the smaller boxes in the larger tins, containing the newspapers, and subsequent packing in mats, could have been done, and—although there is no direct evidence of it—was pre-arranged and accomplished, in China before coming on the steamer, or during the passage,—the dies, engravings, private marks, labels, etc., having been prepared for the occasion; and that the soldering up and packing in mats could have been done, and was done, with the connivance of the searchers and inspectors on the steamer, during the nine days while she lay at the wharf in San Francisco; that the purchase of the opium from Hop Kee and Tuck Kee, packing, stamping, etc., on Dupont street, is an after-thought of the claimant and those engaged in smuggling with him, who are claimed to be thoroughly experienced and skilled in the business,—no such position having been taken or suggested, or evidence of the kind given, in the district court, although Loo Cho Tong, the senior member of the firm of Hop Kee & Co., and Choy Suey were examined as a witness on other points; that it was impracticable to get the opium on the Sydney here and off at Honolulu, and it is therefore improbable that it should be attempted; that it is inconceivable, if the theory of the claimant is true, that he should have failed, in the district court, with the means at hand, to prove the facts now testified to by Kennedy, Choy Lum, Choy Suey, Loo Gee Wing, Tuck Kee, Wy Noon, and McDermot, since they clearly constitute far the most important part of the claimant's case; and that it is impossible to reconcile with the truth of the claimant's theory, or with any theory except that of the government, the conduct, acts, and declarations of Henry Kennedy, the steerage steward of the Tokio, and brother of the claimant, James Kennedy, who was on the watch at the unseasonable hour of the seizure, and who, notwithstanding the interest then manifested by him, has not since appeared at the trial in either court, where his evidence would have been of the highest importance, or the conduct and statements made, and the fears manifested by McDermot and the claimant, James Kennedy, at the time of the arrest, especially when considered in connection with the letters of Goetz, Kennedy, and Woo Ching, in evidence. Some of these suggestions, and especially the fact that the parties were actually engaged in smuggling somewhere; the failure to produce so much valuable evidence on the first trial; the suggestions relating to the action of the two Kennedys, McDermot, Goetz, and Woo Ching, under the circumstances,—are weighty, and entitled to great consideration.

In view of the established facts and the evidence on questionable

points indicated, I am satisfied that the finding on the controlling issue of fact must be determined by the rule of law to be adopted as to where the burden of proof lies, and as to the amount of evidence necessary to control the finding.

Undoubtedly the government introduced ample testimony in the first instance to show probable cause. This being so, under section 909 of the Revised Statutes of the United States, and the numerous decisions upon the statute cited, the burden of proof is thrown upon the claimant to show the innocence of the transaction. This point is conceded, and the claimant assumed that burden, and he now earnestly insists that he has fully discharged the burden, and fully, by affirmative evidence, overthrown the case of the government within the requirements of the law. But a further question arises. The burden of proof being on the claimant, what amount of proof is necessary to discharge that burden and relieve the claimant of the forfeiture? The United States attorney earnestly insists that the claimant is bound to affirmatively show the innocence of the transaction *beyond a reasonable doubt,* contrary to the rule of the criminal law, that innocence is presumed till the contrary is proved, and contrary to the rule that the government must affirmatively show the guilt of the accused beyond a reasonable doubt; and he cites, among other authorities, *The Short Staple,* 1 Gall. 107, in which Judge STORY remarks: "The *onus probandi* rests on him, (the claimant,) and a forfeiture must be pronounced, unless he brings the defense *clear of any reasonable doubt.*" This position is as earnestly controverted by the claimant. If the rule is as insisted on by the government in this particular,—although claimant's counsel maintains a contrary view,—I think the claimant has failed to show the innocence of the transaction beyond a reasonable doubt, and the opium must be condemned. But conceding the rule not to be so rigid as is claimed by the government, the claimant takes another and intermediate position, which, if adopted, would control the case, and its decision will control my finding and decree.

The rule insisted on is that the burden of proof being on the claimant, yet when the proof is all in, no matter from which side it came, the guilt of the parties concerned, upon the whole evidence actually before the court, must affirmatively appear, beyond a reasonable doubt, as in criminal cases, or the goods cannot be condemned; that it is not enough, as in ordinary civil cases, between man and man, that there is a mere preponderance of evidence in favor of guilt. This rule was also combated with great vehemence by the United States attorney, as presenting the turning point in the case, and he frankly, distinctly, and emphatically stated at the argument, and I think correctly and properly, that if the rule, as claimed by him, was rejected, and this rule, as insisted upon by claimant, adopted by the court, the government could not, under the evidence, maintain its case, and there would be no possible use in spending any more time in discuss-

ing the voluminous evidence. The authorities are not in harmony upon questions of this kind, some holding that always, in a civil case, in form, even though involving penalties and questions criminal in character, the ordinary rule in civil cases prevails, that the verdict or finding is to be determined by a mere preponderance of evidence. Others hold that where the acts constituting the ground of action upon which a recovery is sought, constitute a criminal offense, so that it is necessary to prove the offense, in order to recover, the offense must be affirmatively shown by the evidence beyond a reasonable doubt, and that a mere preponderance of evidence is insufficient.

In this case the opium must be condemned, if at all, under section 3082, Rev. St., which provides:

"If any person shall fraudulently or knowingly import or bring into the United States * * * any merchandise, * * * contrary to law, * * * such *merchandise shall be forfeited, and the offender shall be fined in a sum not exceeding five thousand dollars, nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both.*"

If, on an indictment for smuggling, under this section, any party should be on trial, the question, as it is in this case, being, not whether he was in possession of the goods, but whether he imported them contrary to law, he could not be convicted unless the evidence should affirmatively show, beyond a reasonable doubt, that he was guilty. The *forfeiture* of the goods is provided for in the same section as the *fine* and imprisonment, and it is insisted that the forfeiture is as much and as clearly a part of the punishment for the offense committed—inflicted upon the owner of the goods, whoever he may be—as the *fine* imposed by the same section. The goods are his, as much so as his money; and it is argued that to take from him his goods, because he has violated the law, is as clearly a punishment as to take his other money for the same reason; and there is no limit to the amount and value of the goods forfeited, while the additional fine is limited to $5,000.

In this case, the property claimed to be forfeited is said by the United States attorney to be of the value of from $20,000 to $25,000, and this part of the punishment is therefore four or five times as large as that part which can be inflicted in the form of a fine. They are both, it is claimed, but parts of the punishment inflicted by the statute, the only difference being the form in which the conviction is had and the punishment inflicted: one being prosecuted against the goods as the formal party to the record, and in the form of a civil proceeding, and the other against the owner, or the party unlawfully importing the goods, as the formal party, in the form of a criminal proceeding; that only the form is different. In substance and effect the result is said to be exactly the same so far as it affects the rights of the owner, both resulting in punishing the owner to the extent of the value of the property or money taken from him, both being alike a penalty or amercement.

It is therefore insisted that the rule as to the amount of evidence necessary to condemn in the one case and convict in the other, and inflict the punishments prescribed,—which are, in substance and all essentials, alike,—must be the same. I confess there is great force in these positions, and that it is not easy to perceive any reason, which rests upon a sound basis, for making any distinction. If the criminal rule is good as to one part of a punishment, why not as to the other? No matter through what channel, or in what form, a like substantial result is reached. A criminal offense committed is the basis of the proceeding and ground of punishment, alike, in the indictment, and of forfeiture and condemnation on the information, and the same offense must be shown in order to maintain either proceeding. Then, it is plausibly asked, why not required to be proved by the same quantity of evidence, both culminating, not in establishing a mere civil right, but also in the infliction of a punishment for the crime committed? It is well suggested that there may be good ground for a distinction where the form of the action is not only civil, but the end is to establish a mere civil right, and not to punish in part for a crime. As in a civil suit for damages by the sufferer from an assault and battery, the rule may well be different from that in an indictment against the perpetrator for the same offense committed against the laws.

Upon the question now under investigation, not only the authorities in the state courts, but in the courts of the United States, not even excepting the decisions of the supreme court, appear to me to be at variance. *U. S.* v. *The Burdett*, 9 Pet. 690, was an information in admiralty to forfeit the brig, appraised at $6,000, for a breach of the revenue laws. In discussing the case, the supreme court, by Mr. Justice McLEAN, states the rule applicable to the case thus:

"The object of the prosecution against the Burdett is to enforce a forfeiture of the vessel, and all that pertains to it, for a violation of a revenue law. This prosecution, then, is a *highly penal one, and the penalty should not be inflicted unless the infractions of the law shall be established beyond reasonable doubt. That frauds are frequently practiced under the revenue laws cannot be doubted, and that individuals who practice the frauds are exceedingly ingenious in resorting to various subterfuges to avoid detection is equally notorious. But such facts cannot alter the established rules of evidence, which have been adopted as well with reference to the protection of the innocent as the punishment of the guilty.*"

And the rule is again repeated on page 691 in the following language:

"*No individual should be punished for a violation of law, which inflicts a forfeiture of property, unless the offense shall be established beyond a reasonable doubt.* This is the rule which governs a jury in all criminal prosecutions, and *the rule is no less proper for the government of the court when exercising a maritime jurisdiction.*"

In this case, as in that, which was also an information in admiralty *in rem*, it is sought to punish the claimant "for a violation of the law which inflicts a forfeiture of property"—and a large amount of prop-

erty—as a part of the penalty for the offense. If the rule in criminal cases was proper in that case, when the court was "exercising a maritime jurisdiction," why not in this case, it is asked, when exercising a similar jurisdiction?

The rule in criminal cases seems to be recognized in suits for penalties and forfeitures in *Chaffee* v. *U. S.* 18 Wall. 517. The fourth head-note substantially states one of the points decided to be "that in an action for penalties for alleged frauds upon the revenue * * * the burden rests upon the government to make out its case *beyond a reasonable doubt.*" But in *Lilienthal's Tobacco* v. *U. S.* 97 U. S. 237, a later case than either of those cited, the supreme court appears to me to lay down the rule in cases of information *in rem* as it exists in civil causes, as to the amount of proof. This is distinctly done on pages 266, 267. And it is distinctly repeated on page 271, where the court says:

"Suggestion was made during the argument at the bar that the court erred in not instructing the jury that they could not find that the property was forfeited, unless the matters charged were proved beyond a reasonable doubt; but no such exception was taken at the trial, nor is any such complaint set forth in the assignment of errors, nor is there anything in the case of *Chaffee* v. *U. S.* 18 Wall. 516, which conflicts in the least with the views here expressed, as is obvious from the fact that the two cases are *radically different, the present being an information against the property, and the former an action against the person to recover a statutory penalty. Informations in rem against property differ widely from an action against the person to recover a penalty imposed to punish the offender. But they differ even more widely in the course of the trial than in the intrinsic nature of the remedy to be enforced.*"

The court also distinguishes it from the other case cited, though it seems to me that the distinction is not very broad. I regard this case as giving the last expression of the views of the supreme court, and as controlling in this court in this case; also as adopting, in a civil case in form, by information against the goods to enforce a forfeiture, notwithstanding it is essentially criminal and intended to punish a crime, the ordinary rule that a mere preponderance of evidence should determine the finding of a court or verdict of a jury. One rule or the other, either that in civil or that in criminal cases, must be applicable. So far as I am aware no intermediate rule depending on degrees in doubt, or certainly between proof by a mere preponderance of evidence and proof beyond a reasonable doubt, has ever been suggested in the authorities. Any intermediate rule would be difficult of application, if not wholly impracticable. The present case will afford the supreme court an opportunity to review the question, if desired, and to lay down the rule definitely, and draw the line sharply, so as to be beyond further question, for the future guidance of the subordinate courts. There is some ground for believing that the cases cited went off on the special circumstances of the respective cases rather than on strict rules of law. The question, in its various

phases, was discussed and authorities examined in an article entitled "Some Rules of Evidence," in 10 Amer. Law Rev. 642, for the year 1876. See, also, *Welch* v. *Jugenheimer*, 25 Alb. Law J. 271; S. C. 56 Iowa, 11; S. C. 8 N. W. Rep. 673. For the purposes of this case, therefore, in accordance with what I conceive to be the authoritative rule laid down by the supreme court in its latest decisions, I shall apply the rule in ordinary civil cases, that a mere preponderance of evidence in favor of guilt must determine the controlling question of fact as to whether the opium was smuggled into San Francisco on the Tokio or not.

After as careful and dispassionate a consideration of all the facts and evidence in this case as I am capable of giving it, if I were required to determine the title to the property between two citizens, upon precisely the same case, I should say, but with considerable hesitation, that, upon the whole, the preponderance of evidence is in favor of guilt in the transaction. Adopting the same rule as to the quantity of evidence requisite, while the point is not, in my mind, free from serious doubt, I find that the opium in question was smuggled into the port of San Francisco on the steam-ship City of Tokio, and that it was so smuggled with the actual intent to defraud the United States.

I think no unprejudiced mind can carefully consider the testimony in this case and say that it can adopt either theory of the case presented, as to whether the opium was smuggled into San Francisco on the Tokio, or attempted to be smuggled out on the Sydney, and rest with entire satisfaction and confidence in the conviction of the correctness of his determination. There must be some doubt, a reasonable doubt, not a mere fanciful doubt resting upon hypothesis alone, unsupported by evidence, but a doubt suggested by fairly arising out of, and resting upon, substantial evidence. In reaching this result, of course, much direct, positive testimony must be rejected as incredible under all the circumstances surrounding the case.

As the findings of this court, upon the mere weight of evidence, cannot now be reviewed by the supreme court unless some rule of law has been violated, the claimant is entitled to have the principle of law by which I am guided, stated, so that my ruling in that particular may be corrected, and the finding on that ground set aside, if I prove to have been in error. I therefore state the rule adopted, and which controls the finding. If I am wrong in the rule applied, then the finding should be set aside, and a finding in favor of the claimant adopted. The claimant objected to the rule adopted, and he duly excepts to the action of the court in that particular, and the exception is allowed.

So, also, the evidence of the acts and declarations of Henry Kennedy, soon after the capture of the boat and arrest of claimant and McDermot, and the letter of Goetz, with the addition or postscript by James K. Kennedy, and the letter of Woo Ching, found in the same envelope with the letter of Goetz, were admitted and considered

by the court, under objection to the admission of each, and due exception taken by the claimant.

All this evidence so admitted, including the said acts of Henry Kennedy and said letters, were not only admitted and considered, but great importance was attached to it all. Those acts were regarded as wholly inconsistent with claimant's theory of the case, and irreconcilable with much of claimant's direct evidence. It was the preponderating evidence in the case, without which the finding must necessarily have been clearly and beyond reasonable doubt the other way. If, therefore, this testimony was erroneously admitted, the finding should be set aside as having been founded on improper evidence, and a finding for claimant substituted. I state this fact in order that the claimant may have an opportunity to have my action in the premises reviewed, and if erroneous corrected.

I have taken pains to state the entire substance of the evidence upon the doubtful points, in order that the supreme court, on appeal, may see the case, in all its bearings, precisely as it appears to me.

As a conclusion of law, from the ultimate fact as found on the controlling issue, I find that there must be a decree for the government, condemning the opium as forfeited; and it is so ordered.